# In the United States Court of Federal Claims

No. 20-692C

(Filed Under Seal: October 19, 2020)

(Reissued:  October 28, 2020)

|  |  |  |
|---|---|---|
| **GLOCOMS, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Post-award bid protest; best-value |
| | ) | procurement; challenges to the Army's |
| **UNITED STATES**, | ) | comparative evaluation of pertinent |
| | ) | factors governing the procurement |
| Defendant, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **DILLIGAS CORP., d/b/a U.S. GOT** | ) | |
| **PEOPLE**, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

Sheridan Leigh England, S.L. England, PLLC, Alexandria, Virginia, for plaintiff.

Mikki Cottet, Senior Trial Counsel, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Ethan P. Davis, Acting Assistance Attorney General, Robert E. Kirschman, Jr., Director, and Claudia Burke, Assistant Director, United States Department of Justice, Washington, D.C.

W. Stephen Graves, Graves Law Firm, San Antonio, Texas, for defendant-intervenor.

## OPINION AND ORDER[1]

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review the decision and provide proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by asterisks enclosed by brackets, *e.g.*, "[***]."  Some proposed redactions were not accepted because they did not involve confidential or proprietary information.

LETTOW, Senior Judge.

Glocoms, Inc. ("Glocoms") protests the award of a food service workers contract at Madigan Army Medical Center in Tacoma, Washington to Dilligas Corp., d/b/a/ U.S. Got People ("Dilligas") by the United States Army ("Army" or "the government").  Glocoms, the offeror with the lowest bid price, challenges the Army's "best value" determination as inconsistent with the solicitation requirements.  Glocoms seeks injunctive relief to prevent the Army from commencing the contract with Dilligas, a declaration that the award to Dilligas was unlawful, and reasonable attorney's fees associated with the litigation, among other forms of relief.  In conjunction with proceedings in this court, the Army sought and received time to conduct a corrective action, focusing on Glocom's offer, *see* Def.'s Notice of Corrective Action and Resp. to Pl.'s Mot. for Prelim. Inj., ECF No 10,[2] and thereafter reaffirmed the award to Dilligas, *see* Am. Compl. ¶¶ 41-55, ECF No. 19.

The government and Dilligas have submitted motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), or, alternatively, for judgment on the administrative record.  *See* Def.-Intervenor's Mot. to Dismiss or, in the Alternative, for J. on the Administrative R. ("Def-Intervenor's Mot."), ECF No. 27; Def.'s Mot. to Dismiss or for J. on the Administrative R. ("Def.'s Mot."), ECF No. 28.  Glocoms has filed a response and a cross-motion for judgment on the administrative record.  *See* Pl.'s Opp'n to Def. and Intervenor's Mot. to Dismiss and Cross-Mot. for J. on the Administrative R. (Pl.'s Cross-Mot.), ECF No. 31-2.  Briefing has been completed.  *See* Def.'s Reply and Resp. to Pl.'s Cross-Mot. for J. on the Administrative R. ("Def.'s Reply"), ECF No. 37; Intervenor's Resp. to Pl.'s Cross-Mot. for J. on the Administrative R., ECF No. 38; Pl.'s Reply in Opp'n to Def. and Intervenor's Mots. to Dismiss and J. on the Administrative R. ("Pl.'s Reply"), ECF No. 41.  The court held a hearing on September 22, 2020, and the cross-motions are now ready for disposition.

## FACTS[3]

### A.  *Army's Solicitation for Food Service Workers at Madigan Army Medical Center*

The Army posted solicitation number W81K0220Q0057 on April 30, 2020.  AR 6-21, 20-741.[4]  The solicitation detailed the potential award of a fixed price, non-personal service contact at Madigan Army Medical Center in Tacoma, Washington.  AR 6-30 to 31.  The

---

[2] Glocoms had filed a motion for preliminary injunction, *see* ECF No. 4, and the court had deferred acting on that motion until consideration of the merits.  *See* Order of July 1, 2020, ECF No. 18.

[3] The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1 of the RCFC.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[4] The administrative record is divided into tabs and is consecutively paginated.  The record will be cited by tab and page, *e.g.* "AR __-__."

contract, which totaled 22,880 hours, was estimated to provide for approximately 11 full-time food service workers within the Nutrition Care Division dining facility.  AR 6-30.  The contract ran for a one-year performance period from June 15, 2020 to June 14, 2021, plus four option years to end June 14, 2025, if exercised.  AR 6-30.  The solicitation outlined various duties and tasks required for performance under the contract.  *See* AR 6.  The successful bidder was required to offer positions under the contract to individuals employed by the prior contractor, provided that those individuals were qualified for the new positions.  AR 6-70.

The solicitation set forth three factors upon which the bids would be evaluated: technical capability, past performance, and price.  AR 6-119.  The technical capability factor addressed the offeror's ability to "meet[] the minimum qualifications/requirements," and was evaluated on a rating scale of outstanding, good, acceptable, marginal, and unacceptable.  AR 6-119 to 120.  As part of the technical capability factor, offerors were required to submit a backup staffing plan, demonstrating the company's ability "to ensure that there are no gaps in service," AR 6-102, and a mission-essential contractor services plan to ensure continued "performance of essential contractor services," AR 6-103.  The past performance factor looked at "the quoter's performance record on recent, relevant, and similar contract efforts."  AR 6-120.  Recency was defined as performance taking place "within the past three years."  AR 6-120.  Relevancy was considered on a scale from very relevant to not relevant/unacceptable.  AR 6-120.  If past performance was recent and relevant, it was given a confidence assessment, ranging from substantial confidence to no confidence/unacceptable.  AR 6-121.  If the bidder lacked recent or relevant performance, the quote would be assessed at the neutral confidence level.  AR 6-121.  Finally, the price factor employed "cost analysis . . . to evaluate a quoter's price and the extent to which it is fair and reasonable, and balanced."  AR 6-121 to 122.

The solicitation specified that the first two factors—technical capability and past performance—"when combined, [were] significantly more important than price" to the determination of the award.  AR 6-119.  The solicitation provided that the award would be made to the best offer that (1) "[met] the acceptability standards for non-price factors," (2) "[c]onform[ed] to the solicitation," (3) was from a responsible contractor, (4) provided the government with the "best value," and (5) included a price that is "fair and reasonable, and balanced."  AR 6-122.  Therefore, to be eligible for the award, the offer must have received a minimum rating of acceptable in both technical capability and past performance, and also have a price that was determined to be fair and reasonable.  *See* AR 6-122; *see also* Def.'s Mot. at 5.

### B.  *The Army's Independent Government Cost Estimate*

Prior to the solicitation, the Army conducted an independent government cost estimate ("IGCE") to determine guideline amounts for salary, fringe benefits, and total contract price.  *See* AR 2-4 to 7.  Market research indicated that the medium salary for a food service worker in Tacoma, Washington was $38,380.00, and when factoring in benefits and profit, a food service contract awardee could expect to bill the government $58,128.00 per worker.  AR 2-4, 5-14.[5] Additionally, the solicitation provided the wage designated for workers under the current

---

[5] The billable hourly rate at $58,128.00 is $27.95.  AR 5-14.  After subtracting profit and general and administrative expenses, the hourly compensation was estimated to be approximately $22.37.

contract—$23.60. AR 2-4. After considering the current contract price, market research, and the Department of Labor standards, the Army set its IGCE at $3,363,216.87. AR 2-4 to 7. The IGCE was determined by projecting that workers would be paid $14.49 per hour with $8.58 in fringe benefits, for a total of $23.07 of total compensation per worker. *See* AR 2-7.

### C. Glocoms' Offer

Glocoms' proposal set its price at $2,497,477.00—$499,470.40 per year for the initial contract year and four option years. AR 26-848. Under its compensation plan, Glocoms proposed to pay workers a wage of $13.19 per hour with $5.95 per hour in fringe benefits. AR 9-322. Glocoms listed its total hourly compensation, after including paid time off and holidays, at $20.51. AR 9-322. Glocoms' technical proposal also included a backup plan as required by the solicitation. AR 9-320. The backup plan proposed a "contingency pool" that would consist of a "large pool of credentialed staff . . . to replace existing staff . . . and to allow staff to rotate out" for leave, vacation, or emergencies. AR 9-320. Glocoms stated that the pool would not fall below 25 percent of the current active staff on the contract. AR 9-320. Glocoms provided a mission-essential contractor services plan that noted that Glocoms "d[id] not foresee any challenges associated with maintaining essential contractor services during an extended event, such as a pandemic that occurs in repeated waves." AR 9-327.

### D. Dilligas' Offer

Dilligas proposed a contract price of $3,267,264.00, which included yearly increases in price. AR 20-754. The compensation plan provided workers with an hourly wage of $15.33 and hourly fringe benefits of $8.90, for a total compensation of $24.23 per hour. AR 8-247. Dilligas' plan included yearly compensation increases in both hourly wage and fringe benefits. AR 8-247. Dilligas' backup staffing plan centered around shifting existing personnel to cover absences. *See* AR 8-245. The shift lead, "[u]pon notification of an unscheduled absence," would "review[] the schedule and make[] adjustments to the assignments, based on the position needing coverage." AR 8-245. For the mission-essential contractor services plan, Dilligas stated that it would "maintain[] a list of qualified individuals in the local area," including prior employees who left in good standing, for short-term employment as needed. AR 8-248. Dilligas also noted that it would utilize overtime and reassignments to remain fully operational. AR 8-249 to 250.

### E. Evaluation of Offers

The Army received 10 proposals, including those from Glocoms and Dilligas. AR 20-743.[6] Five quotes were removed from consideration because they were incomplete or included an excessively high price. AR 20-743. At close of the solicitation period, the Army evaluated the remaining five proposals. The contracting officer and contract specialist reviewed and rated proposals on past performance, price, and the compensation plan component of the technical capability factor. AR 20-750. The other components of the technical capability factor, including backup plans and mission-essential contractor services plans, were evaluated by a Sergeant First

---

[6] An eleventh quote was not considered because it was submitted after the deadline. AR 20-743.

Class and the Captain serving as Chief of Production and Service for the Nutrition Care Division. AR 20-750. Following evaluation, the five offers were rated as follows:

| Offerors | Technical Capability (Factor 1) | Past Performance (Factor 2) | Price (Factor 3) |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| Glocoms, Inc. | Marginal | Satisfactory Confidence | Unacceptable |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| Dilligas Corp d/b/a/ U.S. Got People | Good | Substantial Confidence | Acceptable (best value price) |

AR 20-755.

Glocoms was rated as "marginal" for technical capability, "satisfactory confidence" for past performance, and "unacceptable" for price. AR 20-755.[7] The Initial Award Determination Memorandum stated that Glocoms' "[b]ack up plan was rated 'marginal' and Mission Essential Contingency Plan 'unacceptable,'" AR 20-755, despite the fact that one evaluator rated Glocoms' technical capability as "'satisfactory' . . . across the board," AR 20-752. The Memorandum specifically noted that the lack of yearly price increases contributed to Glocoms unacceptable price rating. AR 20-752. Glocoms' offer was determined to be ineligible for the award because it did not receive the minimum rating of "acceptable" in all categories. AR 20-750 to 751.

Contrastingly, Dilligas was rated as "good" for technical capability and "substantial confidence" for past performance. AR 20-755. Under the price factor, Dilligas was rated acceptable and found to be the best value price for the government. AR 20-755. One additional offeror other than Dilligas was deemed eligible for the award, while Glocoms and the remaining two offerors were deemed ineligible for the award. AR 20-751 to 753. Based on this evaluation, Dilligas was awarded the contract. AR 22-759 to 760. The government alerted Dilligas of its successful bid on June 1, 2020, AR 22-760, and notified all unsuccessful bidders, including Glocoms, on June 2, 2020, AR 23-839. In response to Glocoms' request, the Army provided Glocoms with a post-award debriefing. AR 24-840, 25-841 to 846. The debrief letter explained the rationale for the Army's award decision, including the determination that Glocoms' price— $2,497,477.00—was not realistic because it was 23.5 percent lower than the IGCE of $3,363,216.87. AR 25-845.

---

[7] While the solicitation stated that price would not be rated, *see* AR 6-121, there was a determination of whether the price was fair and reasonable, AR 6-121 to 122. In the chart of bid comparisons set out in the initial Award Determination Memorandum, a fair and reasonable price was listed as "acceptable," and a price that was not fair and reasonable was listed as "unacceptable." AR 20-755. When the factors were reevaluated following corrective action, the price factor was notated as "fair and reasonable" rather than "acceptable" or "unacceptable." AR 26-849. All bids were determined to be "fair and reasonable" upon reevaluation. AR 26-849.

*F.   Glocoms' Protest and the Army's Corrective Action*

After Glocoms filed its protest in this court on June 9, 2020 and sought a preliminary injunction, *see* Compl.; Pl.'s Mot. for Prelim. Inj., the Army undertook corrective action, *see* Def.'s Notice of Corrective Action and Resp. to Pl.'s Mot. for Prelim. Inj., ECF No. 10. Glocoms' price was reevaluated during the corrective action and was determined to be fair and reasonable.  AR 26-849.  The Army also reevaluated Glocoms under the other two factors.  *See* Def.'s Mot. at 12.  Glocoms' rating remained "marginal" under the technical capability factor while its rating under the past performance factor changed from "satisfactory confidence" to "neutral confidence."  AR 27-855 to 856.  The Army noted that Glocoms' marginal technical capability rating "indicates risk to uninterrupted performance during normal operations or during emergencies."  AR 26-850.  After the corrective action, the reevaluated offers were rated as follows:

| Offerors | Technical Capability (Factor 1) | Past Performance (Factor 2) | Price (Factor 3) |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| Glocoms, Inc. | Marginal | Neutral/Satisfactory Confidence | Fair and Reasonable |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| Dilligas Corp d/b/a/ U.S. Got People | Good | Substantial Confidence | Fair and Reasonable |

AR 26-849.  Despite the changes to Glocoms' ratings, the Army again determined that Dilligas offered the government the best value and awarded Dilligas the contract.  AR 26-851. Thereafter, the administrative record was filed and amended, *see* ECF Nos. 22, 24, and the parties undertook and completed their cross-motions for judgment on that administrative record.

**STANDARDS FOR DECISION**

*A.   Jurisdiction and Standing*

The Tucker Act vests this court with jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

Before reaching the merits, the court must determine whether the plaintiff has standing to challenge the contract award.  The plaintiff has the burden of establishing standing.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "A party seeking to establish jurisdiction under § 1491(b)(1) must show that it meets § 1491(b)(1)'s standing requirements, which are 'more stringent' than the standing requirements imposed by Article III of the Constitution."  *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)).  To meet these more

stringent requirements, a plaintiff must show that it is an "interested party," *see Digitales Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012), and "that it was prejudiced by a significant error in the procurement process," *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009).

An interested party is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Weeks Marine*, 575 F.3d at 1359 (quoting *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Glocoms, as an actual bidder, meets the first requirement to be an interested party. *See* AR 9. As for the second, to have a direct economic interest, the plaintiff must show that it had a substantial chance of winning the contract. *See Digitales*, 664 F.3d at 1384. Additionally, the plaintiff must show prejudice. *See Labatt*, 577 F.3d at 1378. An interested party suffers prejudice from a significant procurement error when "but for the error, it would have had a substantial chance of securing the contract." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (emphasis omitted); *see also Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 21 (2019), *appeal docketed*, No. 2019-2449 (Fed. Cir. Sept. 27, 2019). The prejudice inquiry and the economic-interest inquiry must not be conflated—"an error [may be] non-prejudicial to an economically interested offeror." *CliniComp*, 904 F.3d at 1380; *Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759, 765 (2018) ("Despite the potential relevance of prejudice in determining substantial chance, direct economic interest should still be evaluated separately from prejudice.") A party cannot be prejudiced unless it first has a substantial chance of obtaining the award. *Veteran Shredding*, 140 Fed. Cl. at 765.

The court concludes that Glocoms has standing to bring this protest. As the offeror with the lowest price that included a compensation plan falling within the Department of Labor's wage standards, Glocoms was within the competitive range for the award. Hr'g Tr. 5:4-10, 20:23-25 (Sept. 22, 2020).[8] Glocoms alleges that the Army inappropriately downgraded components of its technical plan, specifically its backup plan, mission-essential contractor services plan, and compensation plan. Pl.'s Cross-Mot. at 10-16. This action, according to Glocoms, led to a "marginal" rating under the technical factor. *Id.* If all errors alleged by Glocoms in fact occurred, Glocoms would likely have had an acceptable, good, or outstanding rating in the technical capability factor. With a higher technical capability factor rating combined with the lowest price, there is a substantial chance that Glocoms would have been determined the best value. Thus, but for the alleged errors, Glocoms would have received the contract and, therefore, has standing to bring this challenge.

---

[8] The date will not be shown in further citations to this hearing.

### B.  Judgment on the Administrative Record

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's review of a protest of the government's decisions regarding the award of a contract.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under the APA, the court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014).

The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), abrogated on other grounds as recognized in *Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *Id.* (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)).  The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In conducting the rational basis analysis, the court looks to whether the "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues," *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).  Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech*, 554 F.3d at 1037 (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).  Protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

## ANALYSIS

The parties present competing motions for judgment on the administrative record.  Defendant and defendant-intervenor argue that the Army's ratings of Glocoms' proposal were rational and within the agency's discretion.  *See* Def.'s Mot.  Glocoms asserts that the administrative record demonstrates the government's actions were arbitrary and capricious because the Army disparately evaluated its proposal in comparison to Dilligas's proposal.  *See* Pl.'s Cross-Mot.

### I.  The Army's Comparative Ratings of Glocoms' and Dilligas' Proposals

Glocoms challenges the Army's determination that Glocoms' technical plan merited a marginal rating.  Compl. ¶ 42-48; Pl.'s Cross-Mot. at 11-16.  Specifically, Glocoms takes issue with the Army's assessment of its backup plan, mission-essential contractor services plan, and compensation plan.  Pl.'s Cross-Mot. at 11-16.  If the Army correctly evaluated and rated its

plans, Glocoms asserts, the Army would found Glocoms' plan to offer the best value and have awarded Glocoms the contract. *See id.* Defendant and defendant-intervenor, in their motions, argue that Glocoms' contentions are without merit because the government acted within its discretionary authority to identify shortcoming of Glocoms' proposal and downgraded it appropriately. Def.'s Mot. at 26-30; Def.-Intervenors' Mot. at 1-3.[9]

## A. Backup Plans

The solicitation required bidders to provide a "back up staffing plan to ensure that there [were] no gaps in service." AR 6-102. Glocoms' backup plan laid out three methods to ensure continuity of staffing. AR 9-320. Glocoms first suggested that it would "hire additional staff on standby" and engage in credentialing for that staff so they were ready in the event of unexpected absences or emergencies. AR 9-320. Glocoms also stated that it engaged in regular recruitment to maintain qualified standby staff. AR 9-320. The bulk of Glocoms' backup staff plan consisted of a contingency pool of credentialed staff that would "allow staff to rotate out" in the event of planned or unscheduled absences. AR 9-320. Dilligas, in contrast, centered its backup staffing plan around empowering shift leaders to adjust schedules and assignments of current workers to cover for absent employees. AR 8-245 to 246. The plan detailed Dilligas' focus on retention, specifically calling out the company's compensation and fringe benefits strategies. AR 8-245 to 246; Hr'g Tr. 32:11-25.

After the corrective action reassessment, Glocoms' backup plan was rated marginal. AR 26-847.[10] The Army stated that a backup plan where "staff does not come to work at [the facility] on a rotational, normal basis" could "result in gaps of service, unskilled labor, or even patient harm." AR 26-847. Dilligas' backup plan was rated "good." AR 20-753. The administrative record provides limited detail of the Army's evaluation of Dilligas' backup plan. One reviewer stated Dilligas "has a plan on how to address unscheduled absences including allowing the on-site lead to track metrics, hours, and shift schedules around as necessary," and that the "focus [was] on retention of valued employees via benefits versus maintaining a 'standby' crew." AR 13-622. Glocoms argues that Dilligas' proposed plan is not a backup plan, but instead a normal business process. Hr'g Tr. 25:3-10. It contends that its plan is "far superior" to Dilligas because Glocoms guaranteed qualified staff ready to step in in the event of absences. Hr'g Tr. 25:18 to 26:6.

---

[9] Glocoms initially challenged the Army's decision to downgrade its past performance rating upon corrective action. *See* Am. Compl. ¶¶ 50-52. Glocoms later withdrew this argument. Pl.'s Cross-Mot. at 16-17 ("[W]ith a complete AR [and Def.'s Mot.], it is now clear that Defendant is not moving away from its corrective action position that 'past performance did not impact the award decision.' Thus, . . . Glocoms . . . withdraws the argument because it does not alter the analysis of the case."). The court, therefore, will not evaluate the Army's past performance determination in detail.

[10] The administrative record states that Glocoms received an "acceptable" rating for its backup plan. AR 26-847. However, the government asserts that Glocoms actually received a "marginal" rating and the use of the word "acceptable" was a typographical error. Def.'s Mot. at 21, Attach. 1 at 4 (Bradbury Decl. ¶ 17).

Agencies awarding contracts are required to give "impartial, fair, and equitable treatment" to all government contractors when evaluating proposals. 48 C.F.R. § 1.602-2(b). When a party challenging a contract award argues that it was disparately evaluated by the agency, the party must show that "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or "that the agency inconsistently applied objective solicitation requirements." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted). If a protester meets the "substantially indistinguishable" standard, "a reviewing court can . . . comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion." *Id.* at 1373 (citations omitted). If the protester does not meet the standard, the court should defer to the agency's judgment and "dismiss the claim." *Id.*

The court finds, after reviewing the Army's assessment and the administrative record, that both Glocoms' and Dilligas' backup plans were ostensibly reasonable. Glocoms' program provided a method of obtaining backup employees and continuous recruiting for its contingency pool and for standby employees. AR 9-320. Dilligas detailed a plan to shift existing personnel to provide coverage. AR 8-245 to 246. The Army could reasonably have determined that either plan could minimize "gaps in service" as required by the solicitation. *See* AR 6-102. While both plans could have been found to meet the solicitation requirements, the Army can consider the shortcomings of the plans. Glocoms' plan did not necessarily provide an opportunity for contingency staff to train or work at the Madigan Army Medical Center. *See* AR 9-320, 14-648. By contrast, Dilligas' plan, by the very nature of cross-training employees and utilizing currently employed workers to cover absences, did not have this same shortcoming. *See* AR 8-245 to 246. The Army could reasonably favor training and experience at the facility featured in Dilligas' plan over the contingency staff pool Glocoms proposed. Therefore, there are substantive differences in the plans, and Glocoms cannot sustain a case for disparate evaluation as related to its backup plan. *See Office Design Grp.*, 951 F.3d at 1372-73.

### B.   Mission-Essential Contractor Services Plans

The solicitation required that bidders include a mission-essential contractor services plan. AR 6-103. The mission-essential contractor services plan needed to contain the offeror's strategy for "continuing the performance of essential contractor services" as detailed in Defense Federal Acquisition Regulation Supplement ("DFARS") 252.237-7024. AR 6-103.[11] As

---

[11] DFARS 252.237-7024 can be found at 48 C.F.R. § 252.237-7024. Section 252.237-7024(b) provides the requirements for a mission-essential contractor services plan. The relevant language is as follows:

(b) The offeror shall provide with its offer a written plan describing how it will continue to perform the essential contractor services listed in attachment ____, Mission Essential Contractor Services, dated ____, during periods of crisis. The offeror shall -
(1) Identify provisions made for the acquisition of essential personnel and resources, if necessary, for continuity of operations for up to 30 days or until normal operations can be resumed;
(2) Address in the plan, at a minimum -

required by regulation, mission-essential contractor services plans must specify: (1) "challenges associated with maintaining essential contractor services during an extended event," (2) the time lapse required to obtain and train qualified personnel, (3) procedures related to identifying, training, and preparing personal, (4) the "alert and notification procedures," and (5) the employee communication strategy.  DFARS § 252.237-7024(b).

       Both Glocoms and Dilligas included a mission-essential contractor services plan in their proposals.  *See* AR 8-248 to 250 (Dilligas); AR 9-327 (Glocoms).[12]  Both plans refer to all requirements of DFARS 252.237-7024.  *See* AR 8-248 to 250; AR 9-327.  Dilligas included a description of its contingency plan, before addressing the challenges associated with maintaining mission-essential services.  AR 8-248 to 249.  Dilligas' plan acknowledged the possibility that staff availability might be affected during the COVID-19 pandemic, by workers caring for family members, supervising children when schools are closed, or becoming ill themselves.  AR 8-249.  Dilligas further stated that it would coordinate its response with government procedures and decision-making.  AR 8-250.  Dilligas' mission-essential contractor plan was rated "acceptable" by both raters.  AR 13-617, 623.

       Glocoms' plan, while briefer than Dilligas' plan, references other components of Glocoms' technical plan, including its recruitment and management approach and training procedures.  AR 9-327.  The main disagreement between Glocoms and the government is whether the Army was entitled to downgrade Glocoms' plan for not fully addressing challenges that could impact performance under the contract.  Def.'s Mot. at 29; Pl's Cross-Mot. at 13-14.  In addressing the first requirement of DFARS 252.237-7024, Glocoms stated that it "d[id] not foresee any challenges associated with maintaining essential contractor services during an extended event."  AR 9-327.  Further, Glocoms' plan did not discuss specific concerns related to the ongoing COVID-19 pandemic.  Following corrective action, the Army rated Glocoms' mission-essential contractor services plan "[u]nacceptable."  AR 26-847.  The Army's evaluators stated that the "plan fail[ed] to provide the detail necessary to ensure [that Glocoms could] provide employees at critical times" and that "[f]ailing to address potential mission impact

---

                         (i) Challenges associated with maintaining essential contractor services during an extended event, such as a pandemic that occurs in repeated waves;
                         (ii) The time lapse associated with the initiation of the acquisition of essential personnel and resources and their actual availability on site;
                         (iii) The components, processes, and requirements for the identification, training, and preparedness of personnel who are capable of relocating to alternate facilities or performing work from home;
                         (iv) Any established alert and notification procedures for mobilizing identified "essential contractor service" personnel; and
                         (v) The approach for communicating expectations to contractor employees regarding their roles and responsibilities during a crisis.

48 CFR § 252.237-7024(b).

     [12] Glocoms titled its mission-essential contractor services plan, "Continuation of Essential Contractor Services."  AR 9-327.

challenges while in a pandemic raise[d] concerns about Glocoms['] preparedness to respond to extraordinary events." AR 26-847.

The government avers that Glocoms' statement was insufficient to meet the requirements of the solicitation and, alternatively, the Army acted reasonably in downgrading the plan. *See* Def.'s Mot. at 20. Glocoms, however, argues that because the Army's own acquisition strategy states that "[t]here are no known challenges associated with locating qualified Food Service Workers Services," AR 5-12, the Army cannot downgrade Glocoms' proposal for stating the same, Pl.'s Cross-Mot. at 13-14. Further, Glocoms asserts disparate evaluation when compared to Dilligas. Hr'g Tr. 26:25 to 27:1 (In response to the government's contention that Glocoms' plan did not reference transportation issues during a pandemic, Glocoms stated that "we see no such criticism of [Dilligas'] mission essential plan.").

The solicitation required bidders to provide information regarding how the company would "continu[e] the performance of essential contractor services" by "at a minimum . . . [addressing] all requirements in accordance with DFARS 252.237-7024." AR 6-103. Regardless of whether Glocoms' statement that it "d[id] not foresee any challenges" met the requirement in DFARS 252.237-7024, AR 9-327, the Army could reasonably determine that Glocoms' plan could result in gaps in service and downgrade it accordingly. There are numerous challenges associated with maintaining in-person workers in a pandemic or other extended event, including the possibility that a worker could become ill or be otherwise exposed to COVID-19. While Glocoms argues that its plan presents an approach to handle such circumstances, the Army did not act irrationally by expressing concern that Glocoms did not acknowledge the possibility of these challenges. The Army could appropriately question the sufficiency of Glocoms' plan, and award it a decreased rating as a result.

Further, the Army did not unfairly decrease Glocoms' rating compared to Dilligas' rating. Dilligas discussed at length its approach to responding to unanticipated, extended events and provided specific examples of challenges related to operating during a pandemic. AR 8-248 to 249. Dilligas' plan also addressed all requirements in DFARS 252.237-7024. AR 8-249 to 250. The Army's rationale for Glocoms' rating—that Glocoms did not detail challenges in maintaining essential services during a pandemic—does not apply to Dilligas' proposal. The Glocoms plan, and the stated reasons for Glocoms' downgrade, are not "substantively indistinguishable" from Dilligas' plan. *See Office Design Grp.*, 951 F.3d at 1372. Due to these substantive differences, the Army did not act arbitrarily or capriciously in downgrading Glocoms' mission-essential contractor services plan.

### C. Compensation Plans

Finally, the parties dispute the Army's evaluation of Glocoms' compensation plan. Def.'s Mot. at 12-13. Glocoms' compensation plan set the level of hourly wage at $13.19, with a total compensation of $20.51. AR 9-322. The parties agree that Glocoms' compensation levels met the minimum requirements by the Department of Labor, Hr'g Tr. 7:6-10, although the compensation level was lower than the compensation paid to workers under the current contract, $23.60 per hour, AR 2-4. Under the solicitation, the awardee of the contract was required to offer current workers their positions, provided those workers remained qualified. AR 6-70. The Army's evaluators believed that Glocoms would have difficulty retaining current staff by

requiring them to take a pay cut. AR 27-855; Hr'g Tr. 6:15 to 19. Glocoms states that these considerations are not appropriate grounds to downgrade the compensation plan. Pl.'s Cross-Mot. at 14-16. The fact that the compensation levels meet the Department of Labor standards, Glocoms asserts, should be definitive evidence of reasonableness. *Id*. at 15. The government argues that it was appropriate for the Army to view Glocoms' lower wages as impacting Glocoms' ability to retain workers or recruit new staff of the positions. Def.'s Mot. at 12-13.[13]

When evaluating the Army's actions, the court must determine "whether the contracting agency provided a coherent and reasonable explanation of the exercise of discretion." *Axiom*, 564 F.3d at 1381 (citation omitted). The Army provided a detailed description of its reasoning following corrective action. *See* AR 26-847. Despite rating Glocoms' compensation plan as "acceptable," AR 14-653, the Army stated that "offering only mandatory minimum wage significantly increase[d] risks over the contract life associated [with] the proposer's ability [to] recruit and retain staff," AR 26-847. Glocoms' proposal would have required current workers to receive lower pay if they decided to accept positions under Glocoms' contract. *See* AR 2-4, 27-855. Additionally, Glocoms' compensation fell below the average salary earned by food service workers in Tacoma, Washington. *See* AR 5-14. The Army could reasonably believe that this lower compensation plan could negatively affect Glocoms' ability to recruit and retain employees. Therefore, the Army's evaluation of the compensation plan as contributing to Glocoms' marginal rating was neither arbitrary nor capricious.

## II.   The Army's Best Value Analysis

The Army's comparative ratings of Glocoms' and Dilligas' technical plans were not arbitrary and capricious. The court must determine whether the Army could reasonably award the contract to Dilligas based on the offeror's respective ratings. Glocoms received a marginal rating for the technical capability factor, a neutral/satisfactory confidence rating for the past performance factor, and a price determination of fair and reasonable. AR 26-849. Dilligas received a good rating for the technical capability factor, a substantial confidence rating for the past performance factor, and a price determination of fair and reasonable. AR 26-849. Glocoms offered a price of $2,497,477, which was significantly lower than Dilligas' price of $3,267,264. AR 26-848 to 849. Because the solicitation was a best-value determination and stated that "all evaluation factors other than price, when combined, [were] significantly more important than price," AR 6-119, the agency has substantial discretion to balance the factors and determine the best value to the government, *AgustaWestland*, 880 F.3d at 1332. The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quotations omitted), when the agency provides "a coherent and reasonable explanation" for its decision, *id*. (citation omitted). The Army reasonably could determine that Dillgas' higher ratings in the past performance and technical capability factors, combined with a price below the Army's IGCE, provided the government with a better value when compared to Glocoms, despite the higher

---

[13] Glocoms' compensation plan did not include yearly increases in wage levels for workers. AR 9-322. In its initial assessment, the Army listed the lack of price escalation as a concern. AR 25-845. Both parties agree that if the Department of Labor increased its minimum wage requirements, an awardee could likewise modify its compensation levels to comply with the increased standard. *See* Hr'g Tr. 7:9-10. The court, therefore, need not evaluate this argument.

price.  The Army stated its reasoning for finding Dilligas to be the best value and that reasoning is not irrational.  Therefore, the Army's award to Dilligas was an appropriate use of agency discretion.

## CONCLUSION

For the foregoing reasons, defendant's and defendant-intervenor's motions to dismiss pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims are DENIED, defendant's and defendant-intervenor's motions for judgment on the administrative record are GRANTED, plaintiff's cross-motion for judgment on the administrative record is DENIED, and plaintiff's deferred motion for preliminary injunction is DENIED as moot.  The clerk shall enter judgment accordingly.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge